IN THE UNITED STATES DISTRICT COURT FOR
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | NO. 3:21-cr-00288 |
| | ) | |
| ERIK MAUND | ) | JUDGE CAMPBELL |
| BRYON BROCKWAY | ) | |
| ADAM CAREY | ) | |

<u>MEMORANDUM AND ORDER</u>

## I.     INTRODUCTION

The Sixth Amendment to the U.S. Constitution expressly guarantees "the accused" fundamental protections that courts throughout our history have acknowledged protect each citizen's right to a "fair trial." *United States v. Gonzalez-Lopez*, 548 U.S. 140, 145 (2006). Modern criminal trials, including the one in this case, are often complex affairs with testimony from numerous witnesses, multiple defendants, hundreds of exhibits (physical and electronic), numerous evidentiary issues and strong advocacy from excellent attorneys. Given that complexity, mistakes can happen, which results in the oft repeated truism: "A defendant is entitled to a fair trial but not a perfect one." *Lutwak v United States*, 344 U.S. 604, 619 (1953). But the right to a fair trial does not – and cannot – yield to the complex nature of a modern criminal trial. Nor can that complexity compromise the bedrock principle that a "fair trial" involves a jury considering only "the 'evidence developed' against a defendant … from the witness stand in a public courtroom where there is full judicial protection of the defendant's right of confrontation, of cross-examination, and of counsel.'" *Parker v. Gladden*, 385 U.S. 363, 364 (1966) (citation omitted).

The Bill of Rights to the U.S. Constitution places a high premium on individual rights and the protection of liberty. At its core, a criminal charge seeks to deprive a citizen of liberty. While the government indicted these defendants for crimes that could result in lengthy jail sentences upon conviction, constitutional protections do not concern themselves with whether a criminal defendant is charged with these types of crimes or charges that may result in a lesser sentence. A fair trial protects principles of liberty in every criminal case.

The fairness of a trial is not solely for the protection of individual liberty of a defendant, as important as that is. Ensuring a fair trial bolsters the confidence of our citizens in our judicial system and assures them that our system of self-government provides a common place where differences—be they criminal or civil—can be adjudicated peacefully and publicly under rules designed to be fair to all parties. In many cases, like this one, the rights and concerns of victims also demand a fair trial. Put simply, citizens, the parties, and victims must have confidence that the result of a criminal trial—be it a conviction or an acquittal—resulted from a trial that respected everyone's rights and comported with foundational constitutional protections.

In this case, an administrative mistake caused certain exhibits not admitted into evidence to be given to the jury as it began deliberations. The Court understands the gravity and impact of that mistake, as well as its impact on the parties, the victims, and potentially the public's view of the trial. Our criminal justice system demands that courts acknowledge when they fail to provide a fair trial and take appropriate action to remedy that failure. The rights of all involved demand no less.

## II.    PROCEDURAL HISTORY

### A.  The Charges and Trial

On November 29, 2021, Erik Maund, Gilad Peled, Bryon Brockway, and Adam Carey were indicted on charges arising out of the alleged March 2020 kidnapping and murder of two victims in Nashville, Tennessee. (Doc. No. 3). The Government filed a Superseding Indictment on July 25, 2022. (Doc. No. 127). The Superseding Indictment charged the Defendants with three counts: (1) conspiracy to commit murder-for-hire in violation of 18 U.S.C. § 1958; (2) kidnapping conspiracy in violation of 18 U.S.C. § 1201(a) and (c); and (3) kidnapping resulting in death in violation of 18 U.S.C. § 1201(a)(1) and (2). (*Id.*).

The Government's theory was that in March 2020, Erik Maund, a married businessman, received extortion demands from William Lanway, who had become aware of Maund's involvement with Holly Williams in Nashville, Tennessee. At the recommendation of a friend, Maund hired Gilad Peled, who owned a security company called Speartip Security, to help him with the problem. Peled, in turn, enlisted the help of Bryon Brockway. After some initial intelligence gathering by others, Brockway and Adam Carey traveled to Nashville, Tennessee. The Government contends that ultimately Maund agreed to pay Peled $750,000 to have William Lanway and Holly Williams murdered and that Peled communicated the order to Brockway and Carey who then kidnapped and murdered Mr. Lanway and Ms. Williams.

In December 2022, Gilad Peled entered a plea of guilty pursuant to a plea agreement with the Government. (Doc. No. 211). The remaining defendants—Erik Maund, Bryon Brockway, and Adam Carey—proceeded to trial. At the close of the Government's proof, the Court granted Maund's motion for judgment of acquittal under Fed. R. Crim. P. 29 as to the charge in Count 2

for conspiracy to commit kidnapping. (Tr. Trans. Vol. 9 (Nov. 14, 2023), Doc. No. 463 at PageID# 4580-4638; Tr. Trans. Vol. 10 (Nov. 15, 2023), Doc. No. 464 at PageID# 4658-63). On November 17, 2023, the jury returned verdicts on the remaining charges. (*See* Redacted Verdict Forms, Doc. Nos. 437 (Maund), 439 (Brockway), 441 (Carey)). The jury found Maund not guilty of kidnapping (Count 3); Brockway and Carey were found guilty of conspiracy to commit kidnapping (Count 2), and kidnapping resulting in death (Count 3); and all three defendants were found guilty of conspiracy to commit murder-for-hire (Count 1). (*Id.*).

### B. Post-Trial Evidence Review

Following the conclusion of the trial, the Clerk of Court received a number of requests for trial exhibits from the media.[1] While gathering the requested exhibits, the Chief Deputy Clerk observed discrepancies between the exhibit list prepared during the trial and the exhibits provided to the jury. Court staff undertook an extensive review to determine whether the discrepancy was merely a problem with the exhibit list itself or whether there was a discrepancy between the exhibits admitted at trial and those provided to the jury.

The Court set a hearing for January 29, 2024.[2] At the hearing, the Court informed the parties that the Court had identified discrepancies in the exhibits provided to the jury. (Hearing Trans. (Jan. 29, 2024), Doc. No. 487). Counsel for the parties discussed their recollection of reviewing the exhibits before exhibits were provided to the jury.[3] (*Id.*). The attorneys confirmed

---

[1]    Over 260 exhibits were admitted at trial. (*See* Amended Exhibit and Witness List, Doc. No. 504).

[2]    The hearing was originally set for January 22, 2024, and was continued to January 24, 2024, and then to January 29, 2024. (Doc. Nos. 456, 480, 482).

[3]    During the May 15, 2024 hearing, the attorneys again discussed their recollection of their review of the exhibits. (Hearing Trans. (May 15, 2024), Doc. No. 542 at PageID# 6241-44).

4

that they reviewed the exhibits either after closing arguments or after the close of proof. (*Id*.). The

Court then provided the parties with a Notice Regarding Trial Exhibits which stated:

> The parties are advised of the following discrepancies in exhibits provided to the jury.
>
> 1. The following exhibits were admitted into evidence and not provided to the jury:
>
>     a)      Government Exhibit 103 – CD with pinger messages
>     b)      Government Exhibit 112 – CD with phone records (CD provided to jury was blank)
>     c)      Maund Exhibit 81 – Aerial surveillance footage of Maund's residence
>
> 2. The following exhibits were not admitted into evidence and were provided to the jury:
>
>     a)      Government Exhibit 254 – photo from execution of search warrant at Carey property
>     b)      Government Exhibit 257 – photo from execution of search warrant at Carey property
>     c)      Carey Exhibit 3 – Unredacted recording of Brockway / Conaway conversation
>     d)      Carey Exhibit 4 – Partial transcript of unredacted recording of Brockway / Conaway conversation
>     e)      Maund Exhibit 8 – JP Morgan Chase Bank records for Speartip (from USB drive)
>     f)      Maund Exhibit 9 – JP Morgan Chase Bank records for Speartip (from USB drive)
>     g)      Maund Exhibit 51 – Excel spreadsheet of text messages to and from Holly Williams from June 6, 2018, through March 11, 2020 (from USB drive)
>     h)      Maund Exhibit 59 – Video surveillance footage from Holly Williams' apartment (from USB drive)
>     i)      Maund Exhibit 78 – Video surveillance footage from Holly Williams' apartment (from USB drive)

(Doc. No. 502). The Court later became aware that Government Exhibit 359, from which a

reference to the date the murders occurred was to have been redacted, was included with the

government exhibits in its unredacted form. This exhibit was inadvertently not included in the Notice, but was identified by defendants before a subsequent hearing.[4]

The Court allowed the parties until February 19, 2024 (three weeks from the date of the hearing), to file motions concerning the information provided in the Notice, and ordered that the motions should be limited only to the exhibit discrepancies. (*See* Doc. No. 485). The deadline to file other post-trial motions was continued until after the resolution of the issues raised during the January 29, 2024 hearing. (*Id*.).

Each of the defendants filed a motion for new trial based on the exhibit discrepancies. (Doc. Nos. 491 (Brockway), 493 (Maund), 496 (Carey)). The Government filed a consolidated response. (Doc. No. 500). And each of the defendants filed a reply. (Doc. Nos. 506 (Carey), 511 (Brockway), 513 (Maund)). Briefing was complete on March 18, 2024.

The defendants universally argued that the Court should grant a new trial without a further hearing because the discrepancies in the exhibits submitted to the jury constituted structural error. Defendants further argued that a subsequent hearing would be constitutionally inadequate given the circumstances surrounding the evidence at issue, the time that had passed since the trial, post-trial publicity, and the restrictions on inquiry into jury deliberations imposed by Fed. R. Evid. 606. The government disagreed, pointing to Sixth Circuit authority stating that if there is prima facie evidence that an unauthorized communication may have affected the verdict, the court must hold

---

[4]     On May 15, 2024, the morning of the *Remmer* hearing, counsel for Maund notified the Court of an irregularity with the exhibits provided to the jury that had not been included in the Notice provided to the parties in January. Government Exhibit 359, which was a CD containing a list of dates of wire transfers from Maund to Peled's company, Speartip, and the statement "homicides occur" on the date of the murders, should have had the extraneous statement redacted. A note on the CD indicated that it was "not redacted, should be redacted per transcript." (Hearing Trans. (May 15, 2024), Doc. No. 542 at PageID# 6080-86).

a hearing pursuant to *Remmer v. United States*, 347 U.S. 227 (1954). (Gov't Response, Doc. No. 500 (citing *Ewing v. Horton*, 914 F.3d 1027, 1031 (6th Cir. 2019)).

### C. Duty to Investigate Extrinsic Influence on Jury

The Sixth Circuit has made clear that "[w]hen a trial court is presented with evidence that an extrinsic influence has reached the jury which has a reasonable potential for tainting that jury, due process requires that the trial court take steps to determine what the effect of such extraneous information was on that jury." *Ewing*, 914 F.3d at 1030 (quoting *Nevers v. Killinger*, 169 F.3d 352, 373 (6th Cir. 1999), abrogated on other grounds by *Harris v. Stovall*, 212 F.3d 940 (6th Cir. 2000)). "In other words, [w]here a colorable claim of extraneous influence has been raised, [an evidentiary hearing] must be held to afford the defendant an opportunity to establish actual bias." *Id.* (quoting *United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999)); *see also United States v. Walker*, 1 F.3d 423, 430 (6th Cir. 1993) (finding the trial court had a duty to conduct a hearing when the jury was inadvertently provided evidence that had not been admitted at trial). The hearing is often referred to as a *Remmer* hearing. *Ewing*, 914 F.3d at 1030.

The Court concluded that a *Remmer* hearing was a necessary first step and scheduled that hearing for May 15, 2024. (*See* Doc. Nos. 518, 523, 526).

### D. The Exhibits at Issue

As previously indicated, three exhibits were admitted into evidence, but not provided to the jury, nine exhibits were provided to the jury that had not been admitted into evidence, and one exhibit did not include redactions that had been ordered by the Court. The parties focus on the

alleged prejudice arising from Carey Exhibits 3 and 4.[5, 6] To understand why, some background is necessary.

       1.  <u>Pretrial Evidentiary Rulings</u>

Gilad Peled pled guilty to the charges in the superseding indictment. (Doc. No. 211). The remaining defendants—Erik Maund, Bryon Brockway, and Adam Carey—requested separate trials based on concerns of antagonistic defenses, spillover evidence, and constitutional concerns from statements of non-testifying codefendants implicating another defendant as identified in *Bruton v. United States*, 391 U.S. 123, 137 (1968). (*See* Doc. No. 137 (Carey); Doc. No. 139 (Maund); Doc. No. 251 (Brockway); Doc. No. 334 (Carey motion to reconsider)). The Court found severance was not warranted and denied the motions. (Orders, Doc. Nos. 176, 279, 383). In denying the motions for severance, the Court found that the *Bruton* issues raised by the parties could be addressed with appropriate redactions. (*Id.*).

Before the trial began, the defendants collectively filed over one dozen motions in limine seeking to exclude evidence. (Doc. Nos. 283, 284, 285, 286, 287, 288, 292, 297, 298, 299, 300,

---

[5]    Carey also argues prejudice from the jury being inadvertently provided Government Exhibits 254 and 257, which were photographs of boxes of ammunition taken at Carey's residence pursuant to a search warrant the day of his arrest on December 10, 2021. The Court denied Carey's motion to exclude these photographs (Doc. No. 384), but the Government voluntarily opted not to seek to admit them. It did, however, admit four substantially similar photographs into evidence. (Gov't Exs. 250, 255, 256, 258). Even if the jury did specifically consider the unadmitted photos, the Court finds these two exhibits did not result in structural error, nor was there a potential for such consideration to affect the verdict.

[6]    Maund also argues that he was prejudiced by the submission of an unredacted version of Government Exhibit 359, which was a CD containing a summary of electronic funds transfers and the dates of those transfers from Maund to Peled's Speartip bank account. The words "Homicides occur," which indicate the date of the homicides relative to the financial transactions, were redacted during presentation of the exhibit during trial. (*See* Tr.Trans. Vol. 9 (Nov. 14, 2023), Doc. No. 463 at PageID# 4538). Given that there was no dispute about the date of the homicides, the Court finds no structural error or prejudice from the jury's potential consideration of the unredacted document.

8

351, 352, 360, 387, 407). Among the evidence defendants sought to exclude were recordings of conversations in which the Government contends Bryon Brockway and Adam Carey agreed to participate in an additional murder-for-hire scheme similar to the one charged in this case. (Doc. Nos. 292, 297, 299). There is no dispute that the new murder-for-hire scheme was entirely fictional, but the Government asserted that, in agreeing to the fictional murder-for-hire scheme, Brockway and Carey made statements about the murders at issue here. (*See* Notice by the United States of Intent to Offer Evidence Pursuant to Rule 404(B), Doc. No. 204).

The Government filed transcripts that corresponded to the five recorded statements it intended to play at trial.[7] The recordings were redacted to address constitutional concerns that arise when statements of a non-testifying codefendant directly implicate another defendant. *See Bruton*, 391 U.S. at 137. The Court ruled that these recorded conversations would be admitted. (*See* Pretrial Conf. Trans. (Oct. 23, 2023), Doc. No. 486 at PageID# 5580; Order, Doc. No. 385 (denying

---

[7]     The Government filed transcripts that corresponded to the five recorded statements it intended to play at trial:

(1)     Recorded phone call between David Conaway and Adam Carey on Sept. 21, 2021 (Doc. No. 363-1 (Trial Exhibit 126 (for identification only));

(2)     Recorded phone call between David Conaway and Bryon Brockway on Sept. 22, 2021 (Doc. No. 363-2 (Trial Exhibit 128 (identification only);

(3)     Recorded meeting between David Conaway and Adam Carey on Sept. 29, 2021 (Doc. No. 363-3 (Trial Exhibit 130 (identification only));

(4)     Recorded meeting between David Conaway and Bryon Brockway on Oct. 25, 2021 (Doc. No. 363-4 (Trial Exhibit 132 (identification only));

(5)     Recorded call between David Conaway and Bryon Brockway on Nov. 20, 2021 (Doc. No. 363-5 (Trial Exhibit 134 (identification only)).

motions to exclude and ordering additional redactions of irrelevant portions of those conversations)).

One of these recordings was of a meeting between Bryon Brockway and David Conaway, a cooperating government witness, on October 25, 2021. (Gov't Exs. 131 (recording), 132 (transcript)). Among the redactions from this recording was a statement by Bryon Brockway in which he referred to "Adam" by name. (*Id.*). The context of the reference to "Adam" is as follows. After seemingly detailing the execution of the murders that are the subject of the charges in this case, Brockway told Conaway that the value of using a vehicle—being "mobile" as opposed to "static"—was that "they're never going to figure out where the original X was." (Gov't Exs. 131, 132). Brockway then stated, "Uh, Adam didn't know any of this shit." (Carey Exs. 3 (recording), 4 (transcript)). The statement, "Adam didn't know any of this shit," was redacted from the recording and the transcript offered by the Government.

### 2. Newly Disclosed Evidence

Days before the trial was set to begin, the Government informed the defendants that on October 23, 2023, Gilad Peled recalled "an additional fact that [the government] had not learned from any session prior to the session on 10/23." (Sealed Doc. No. 387-1). Specifically, Peled told the government that Peled recalled:

> [H]e saw Bryon Brockway and Adam Carey together again a few months after the murders. He described it as being in the summer time (but did not know the specific date) and that they ate at a waterfront restaurant in the Lake Travis area of Austin, Texas. He generally described the restaurant and its location, but, at the time, could not recall the name of the restaurant. He stated that on that occasion, Peled, Brockway, and Carey had lunch together and during this lunch Mr. Peled asked Brockway and Carey if they had heard anything about the murder investigation. Mr. Peled said he remembered Mr. Carey saying words to the effect (paraphrased): 'No and we never will. No one cares about those two people.'"

(*Id.*). Subsequent investigation disclosed that on July 9, 2020, Brockway and Carey made purchases at a restaurant matching the description given by Peled. (*Id.*). The Government initially told the defendants that it intended to ask Peled about this conversation. But following Adam Carey's motion to exclude the statement or, alternatively, to continue the trial (Sealed Doc. No. 387), the Government stated that it would not elicit testimony about Carey's alleged statement in its case-in-chief and suggested the motion be denied as moot. (Sealed Doc. No. 390). The Government also submitted that no other party should be able to use the statement for any purpose "given Defendant Carey's motion and the United States position in this filing." (*Id.*). However, the Government held open the possibility that its position concerning the statement might change if, for example, "any defendant opens the door for it to be needed." (*Id.*).

Based on the Government's representation that it would not seek to introduce Carey's statement from the July 2020 meeting in its case-in-chief, the Court denied Carey's motion without prejudice to raising contemporaneous objections at trial should any party seek to admit evidence of the alleged statement. (Doc. No. 392).

### 3. Evidentiary Rulings and Evidence at Trial

Jury selection for the joint trial began on November 1, 2023.[8] (*See* Doc. No. 393). The parties presented opening arguments on Friday, November 3, 2023. (Tr. Trans. Vol. 3 (Nov. 3, 2023), Doc. No. 457). Before opening arguments, counsel for Defendant Maund informed the Court that Maund wanted to present evidence of the July 2020 meeting between Peled, Brockway, and Carey. (*Id.* at PageID# 2969, 3244-48). Maund argued that the fact of the meeting, which

---

[8] The trial was originally scheduled to being on October 31, 2023, but was continued to November 1, 2023, without objection by the parties. (*See* Doc. No. 340).

excluded Maund, together with Carey's statement, is exculpatory or at least relevant as to Maund's guilt. (*Id*. at PageID# 3247-50). Maund was not the only defendant who thought Carey's alleged statement was helpful to his defense. Bryon Brockway also argued that the statement indicated that Brockway did not shoot the victims and was therefore "fair game." (*Id*. at PageID# 3250). Counsel for Brockway explained that, based on the opening statements, he expected Carey to argue that Brockway "somehow put a figurative gun to Adam Carey's head and made him do this." (*Id*. at PageID# 3252). Brockway argued that the meeting gives rise to an inference that "these people are talking together about the crime," therefore it is only fair to include what Carey said at the meeting because it contradicts Carey's theory that Brockway made him commit the murders. (*Id*.).

Because Peled was not scheduled to testify for several days, the Court deferred consideration of the issue of whether Maund or Brockway would be permitted to elicit testimony from Peled about the July 2020 meeting and Carey's alleged statement. (*Id*. at PageID# 2971, 3255-56).

The following Monday morning, Carey returned with a written motion to preclude the co-defendants from introducing the statement, or, in the alternative, declare a mistrial and sever his case from that of his co-defendants. (Doc. No. 444).[9] Carey reiterated his argument that the untimely disclosure, which he did not contend was the fault of the government, could only be remedied by either exclusion of the evidence of the meeting altogether or by severance. (*Id*.; *see also* Tr. Trans. Vol. 3 (Nov. 3, 2023), Doc. No. 457 at PageID# 3255).

---

[9] Carey's first motion was directed at the Government presenting evidence of Carey's alleged statement. (Sealed Doc. No. 387). Carey's second motion was directed at his co-defendants. (Doc. No. 444). Due to difficulties with the electronic docketing system, this motion was presented to the Court and the parties on November 6, 2023, but not electronically docketed until a later date, which resulted in non-sequential docket number assigned to the motion.

The Court ruled that the defendants would be permitted to cross examine Peled on the fact that the meeting occurred, when it occurred, and who was there, but could not elicit testimony about what was said at the meeting—specifically Adam Carey's alleged statement. (Tr. Trans. Vol. 4 (Nov. 6, 2023), Doc. No. 458 at PageID# 3272). The Court stated that if Carey presented evidence concerning the theory that he forecasted during opening statements—that Brockway made him commit murder—the Court would reconsider whether to allow evidence of Carey's alleged statement during the July 2020 meeting and held open the possibility that Peled could be recalled to testify. (*Id*. at PageID# 3272-74).

Peled testified on November 6, 2023. (Tr. Trans. Vol. 4 (Nov. 6, 2023), Doc. No. 458). The questioning about the July 2021 lunch meeting was succinct and appeared to be aimed at attacking Peled's credibility:

> Perry Minton (counsel for Maund): …at the time of the interview, December 10, 2021, you said you didn't know Adam Carey; correct?
>
> Peled: That is correct.
>
> Minton: But you had eaten lunch with Adam Carey. You said you didn't know him, and you said you could recognize them by pictures. You recall that?
>
> Peled: Yes.
>
> Minton: Okay. And you said you didn't know him, but you had had lunch with him, had you not?
>
> Peled: I had lunch with him about six months after the case. And once I remembered that, I – I brought it up to the prosecutors and told them that that was the case.
>
> Minton: And the funny thing is, is that you didn't remember that, supposedly, until about two weeks ago?
>
> …

| | |
|---|---|
| Minton: | Well, but what you're saying, though, doesn't make sense because you had an opportunity at the time on December the 10th to talk about that – hold on. And then you had the opportunity with one of the finest lawyers in the country – |
| Peled: | That is correct. |
| Minton: | Mr. Rusty Hardin. Okay. You had met with the government. And what you're – that's the window. That's the window for you to – you're saying that jail does these terrible things to you, but yet you remember it almost two years later, or longer than that now. |
| Peled: | That is correct. That is correct. |
| Minton: | Is that another lie that you told on December 10th, sir? |
| Peled: | Absolutely not. |
| Minton: | It's not? |
| Peled: | It's not a lie. As soon as I remembered – as soon as any detail of this case came to my mind, I spoke with my lawyers immediately and brought it to their attention. |

(*Id*. at PageID# 3440-41).

To preserve his testimony about the specific things discussed during the meeting, Peled testified about the July 2020 meeting out of the presence of the jury. (*Id*. at PageID# 3529-31). Peled confirmed that it was just himself, Carey, and Brockway at the meeting and stated that when he "asked if there was any news, if they have any development in the case, [that Carey] said, 'Don't worry about it. Nobody cares about them. They're low, common criminal. Nobody cares about them.'" (*Id*. at PageID# 3531).

A few days later, the Court had occasion to revisit the ruling on the admissibility of Carey's alleged statement at the July 2020 lunch meeting. As explained above, to address *Bruton* concerns, Brockway's statement that "Adam didn't know any of this shit," had been redacted from the recording that the Government played for the jury of the October 25, 2021 meeting between

Brockway and Conaway. (Gov't Ex. 131). But Carey wanted the jury to hear that he "didn't know any of this shit" and sought to introduce a clip of the same conversation without that specific redaction. (Tr. Trans. Vol. 7 (Nov. 9, 2023), Doc. No. 461 at PageID# 4109-10).

Brockway did not object to the statement coming in, but argued that introduction of the statement opened the door to "what Adam did know in the conversation in July at the restaurant." (*Id*. at PageID# 4109-10). Counsel for Brockway explained, "The only reason it becomes relevant for them to put [that statement] in is to go, 'He didn't know anything. He didn't know what was happening. Mr. Brockway said so.' And then I have the obligation to show that he did know. And he did know. He knew that they weren't going to hear from them again." (*Id*. at PageID# 4110). "[T]he context of the conversation that they're in is talking about cars, being mobile and the ex and all this different stuff. And then he says, 'And Adam didn't know anything about this.' That's going to put me squarely in the position to have to show he, in fact, did. This goes right back to that theory of the hapless rube.'" (*Id*. at PageID# 4111). The Court agreed that Carey introducing the statement "Adam, didn't know any of this shit" would open the door to the defense putting on evidence of Adam Carey's alleged statement during the July 2020 meeting and left Carey with the choice of whether to introduce the statement. (*Id*. at PageID# 4114 ("It's your difficult choice Mr. Perry [counsel for Adam Carey], but it's your choice, nonetheless.")).

Later that day, outside the presence of the jury, Carey made an offer of proof of Brockway's statement on October 25, 2021, that "Adam didn't know any of this shit." Carey submitted a USB drive with the unredacted recording (Carey Ex. 3) and a one-page transcript of this portion of the recording (Carey Ex. 4), which were marked for identification. (*Id*. at PageID# 4282-83).

15

These exhibits were among those inadvertently provided to the jury. At the time of the Court's post-trial review, the transcript (Carey Ex. 4) was marked in blue ink with "C4" in the upper corner and the words, "Adam didn't know any of this shit," were underlined in blue ink. (*See id.*).

### E. Post-Trial Hearing

The Court held a *Remmer* hearing on May 15, 2024, at which the individuals who served on the jury were called to testify. (Doc. No. 536, 537; Hearing Trans. (May 15, 2024), Doc. No. 542).

### 1. Scope of Questioning

The scope of jury testimony during an inquiry into the validity of the verdict is circumscribed by Federal Rule of Evidence 606(b), which provides that "a juror may not testify about any statement made or incident that occurred during the jury's deliberations; the effect of anything on that juror's or another juror's vote; or any juror's mental processes concerning the verdict[,]" with the exception that a "juror may testify about whether [] extraneous prejudicial information was improperly brought to the jury's attention." Fed. R. Evid. 606(b)(2)(A). Courts applying this rule have not limited the inquiry strictly to "whether" extraneous information was brought to the jury's attention. Instead, mindful that the purpose of the *Remmer* hearing is to determine the impact of the extraneous information on the verdict, courts allow juror testimony concerning the degree of exposure to the extraneous information and whether the information was considered by the jury, but not testimony about a juror's own mental processes concerning the verdict. *See e.g.*, *In re Sittenfeld*, 49 F.4th 1061, 1068 (6th Cir. 2022) (stating that, "[p]ursuant to Federal Rule of Evidence 606(b), the district court forbade counsel from asking about jury

16

deliberations, except whether the deliberations had included reference to any extraneous prejudicial information or other outside influences on the jury"); *United States v. Cooper*, 868 F.2d 1505 (6th Cir. 1989) (when government attorney's notes were inadvertently provided to the jury, the trial court asked jurors whether they had seen or read the notes); *see also*, *United States v. Blackwell*, 459 F.3d 739, 769 (6th Cir. 2006) (stating that "[a]lthough a juror may testify about extraneous, prejudicial information brought into the deliberations, the juror may not testify about his or her own mental processes, i.e., how the jury reached his or her verdict"); *United States v. Davis*, 177 F.3d 552, 557 (6th Cir. 1999) (remanding for *Remmer* hearing at which defense counsel may question jurors to establish that "improper extra-judicial comments influenced the jurors' deliberations").

With this in mind, the Court ordered that juror testimony would be limited to *whether* they considered the specified exhibits, but not *how* they considered them. (Order, Doc. No. 518). The scope of questioning would be limited to: (1) whether and to what degree the jury viewed the specified exhibits; and (2) whether and to what extent the deliberations included reference to any of these exhibits. (*Id.*). The Court ordered that the questioning would not include questions about the content of any deliberations or mental processes concerning the specified exhibits. (*Id.*).

### 2. Exhibit Presentation

Before questioning of the jurors began, counsel for Maund posed questions about the presentation of the exhibits to the jury – specifically about handwritten notes and markings on the binder slip sheet, divider tabs, exhibits, and sticky notes affixed to the exhibits. (Hearing Trans. (May 15, 2024), Doc. No. 542 at PageID# 6080-86). The Chief Deputy Clerk, who participated in the exhibit review, provided information in response to these questions. (*Id.*). The courtroom

17

deputy, who was responsible for managing the exhibits during and immediately after the trial, was not available during the hearing.

The Chief Deputy Clerk stated that the exhibit binders were as they appeared when received back from the jury. (*Id*. at PageID# 6087-88). She was asked about the writing on the front of the red defense exhibit binder and confirmed that she did not write on the binder and did not know who wrote it. (*Id*. at PageID# 6088). She stated that she added blank post-it notes to Maund Exhibit 151 and placed the Maund USB drive and a copy of the USB drive in separate envelopes, but did not make any of the notes on the binder tabs or on the cover of the binder.[10] (*Id*. at PageID# 6088-93). The Chief Deputy Clerk also confirmed that she did not make any markings on Carey Exhibit 4. (*Id*. at PageID# 6093).

At the hearing, the Chief Deputy Clerk and the Court understood that the evidence and evidence binders as they were reviewed post-trial were in the same form as when they were presented to the jury. When the Court initiated a review of the exhibits in response to media inquiries, the Government exhibits were in the two white binders used at trial, and the defense exhibits were all in a red binder, with handwritten tabs delineating the separate exhibits for each defendant. The red binder had the cover sheet created by Maund's defense team. Handwritten additions to this cover sheet stated: "Brockway Exhibits," "Carey Exhibits," and "(flash drive included)."

---

[10]     The Chief Deputy Clerk stated that the following markers were present when she received the exhibit binders from the courtroom deputy: (1) tabs with handwritten notes stating, "on flash drive"; (2) a tab stating "Brockway"; (3) a sticky note, but no tab, delineating "Maund 79"; (4) and a sticky note on Carey exhibit 6 that states "C6." (Hearing Trans. (May 15, 2024), Doc. No. 542 at PageID# 6092-93).

During the trial, however, each defendant had a separate exhibit binder in a different color. Maund's exhibits were in a red binder. Brockway's exhibits were in a black binder. And Carey's exhibits were in a white binder with a blue slip sheet.

The Court understood before and during the *Remmer* hearing that the defense exhibits were combined and sent to the jury in a single binder—the red binder. After the hearing, however, while attempting to gather information in response to questions from Maund's counsel about the handwriting and sticky notes in the binder that could not be identified by the Chief Deputy Clerk, the Court learned, for the first time, that the defense exhibits were combined into a single binder *after* the verdict. And it was at that time, *after* the trial, that the handwritten markings on the slip sheet, and the internal dividers for "Brockway" and "Carey" were added. (*See* Doc. No. 541).

Unfortunately, this misunderstanding had the consequence that when the jurors were questioned about whether they had viewed certain defense exhibits, they were asked if they recalled looking in a "red binder," when the exhibits at issue had not been provided to them in a red binder.[11]

    3.   Testimony

During the hearing, the jurors testified individually concerning their review of the exhibits at issue. (Hearing Trans. (May 15, 2024), Doc. No. 542). The Court asked a series of questions and then counsel for each of the parties had the opportunity to ask additional questions.[12]

---

[11]     Defendants argue that the misunderstanding about the presentation of exhibits and the delay in time between the trial and the *Remmer* hearing rendered the hearing constitutionally ineffective.

[12]     Before the hearing, the parties submitted lists of proposed question for the court to ask the jurors. (*See* Doc. Nos. 532, 535). The morning of the hearing, the Court provided the parties with a list of the questions it intended to ask and gave the parties the opportunity to raise objections to the proposed questions. The Court modified the wording of certain questions to address the parties' comments. (*See* Hearing Trans. (May 15, 2024), Doc. No. 542 at PageID# 6062-6080).

The jurors were questioned about their review of the evidence in general, as well as their knowledge of specific unadmitted exhibits that were included with the admitted exhibits. The jurors universally agreed that they did not look at all of the exhibits during their deliberations, instead they focused on certain exhibits. Virtually all of the jurors recalled that the jury listened the recording of the October 25, 2021 meeting between Brockway and Conaway during their deliberations. The jurors were asked if they recalled seeing five specific exhibits: the two photos of ammunition (Gov't Exs. 254, 257); the USB drive containing the unredacted excerpt of the recording of the October 25, 2021 meeting (Carey Ex. 3); the one-page transcript of the excerpt (Carey Ex. 4); and the unredacted summary of bank transfers from Maund to Peled (Gov't Ex. 359). All of the jurors agreed that their memory of the trial and deliberations had faded.

### a. Photos of Ammunition

Juror Nos. 2, 3, and 12 recalled viewing photos of ammunition, but did not specifically recall Government Exhibits 254, 257. (Hearing Trans. (May 15, 2024), Doc. No. 542 at PageID# 6132, 6163, 6219-20). Similarly, Juror No. 13 could not recall with certainty whether he looked at photos of ammunition during deliberations or only during the trial. (*Id.* at PageID# 6230). The remaining jurors stated that they either did not look at photos of ammunition during deliberations or did not recall having done so. (*Id.* at PageID# 6101, 6111, 6122, 6144, 6154, 6172, 6192, 6209).

### b. Transcripts

Eleven of the twelve jurors testified that they did not see or did not recall seeing any transcripts during deliberations.[13] (*Id.* at PageID# 6099-6100, 6111, 6121, 6143, 6153, 6163, 6170,

---

[13]      Juror No. 7 initially stated that she recalled seeing a transcript in the jury room, but it became apparent during her testimony that she misunderstood what a transcript was and thought it referred to the recording itself. (Hearing Trans. (May 15, 2024), Doc. No. 542 at PageID# 6188-89). After the Court

6190, 6206-07, 6218, 6228-29). Juror No. 2 testified that she saw a transcript in the jury room but spent very little time reviewing it and that there were no discussions about the transcript. (*Id*. at PageID# 6131). When shown Carey Ex. 4, Juror No. 2 testified as follows:

Court:      Okay. You mentioned earlier a transcript. Do you know whether the transcript – the portion of the transcript that's in front of you, do you know whether that's the specific one you recall reviewing?

Witness:    I do not know if this is the specific one, but I do remember the conversation was between those two people.

Court:      Which two people?

Witness:    Conway and Brockway.

Court:      Again, you recall seeing a transcript of this as opposed to just listening to the conversation?

Witness:    Both, yes.

Court:      Because transcripts were [] provided during the trial. And do you specifically remember looking at a transcript during your deliberations as opposed to seeing it in trial?

Witness:    I'll say I don't recall because I feel like we did because we couldn't understand parts of the recording.

Court:      Okay. So during deliberations you have a memory of looking at a transcript?

Witness:    I feel like I do, yes.

_____

explained that a transcript was written as opposed to a recording, she said she could not recall if there were transcripts in the jury room. (*Id*. at PageID# 6190).

Juror No. 10 also at first stated that she recalled seeing a transcript in the jury room, but then said that she could not recall and that she was having trouble distinguishing between the trial and deliberations. (*Id*. at PageID# 6206-07).

Juror No. 13 also at first stated that she recalled seeing transcripts, but then corrected herself, explaining that she did not think they had transcripts in the jury room. (*Id*. at PageID# 6229). Later in her testimony she was more confident in her memory and stated, "Now I'm recollecting, we didn't have anything to read, so we kind of had to replay them to hear certain parts." (*Id*. at PageID# 6236-37).

(*Id*. at PageID# 6133-34).

Juror No. 5 was included in the Court's count of jurors who testified that they did not see transcripts during deliberations because she testified that she did not personally see a transcript in the deliberation room. (*Id*. at PageID# 6170). But Juror No. 5 did say that she was "sure it was in there and one person opened it." (*Id*.). Juror No. 5, for whom English was not a first language, was sure that the person who was playing the recordings was also reading from something. "[W]e had one person who was putting all the CDs and everything in and sometimes reading some of the stuff to us." (*Id*. at PageID# 6181). But she did not see the transcript herself and agreed the juror could have been reading from something else such as another exhibit, notes, or even the jury instructions. (*Id*. at PageID# 6184).

Juror No. 5 was specifically asked whether one of the jurors was reading from something to clarify what was being said during the recordings and answered, "No, it was just when we stopped—I mean literally we went through a lot of, like—listened to some of them over and over and over again … if somebody didn't understand, then ... she was, like, reading some of the stuff and then listen to it again and again." (*Id*. at PageID# 6181-82; *see also id*. at PageID# 6179 (stating that the jury listened to some of the recordings "over and over again just to make sure that we hear[d] what we really heard").

The jurors who were called to testify later in the hearing did not share Juror No. 5's recollection of someone reading from the transcript. (*See id*., PageID# 6199, 6225, 6236). To the extent Juror No. 5 believed the juror who was "reading some of the stuff" was reading from a transcript of the recordings, the Court finds she was likely mistaken. It bears noting that some of the contradictions in her testimony may have been due to difficulty understanding the nuance in

22

the questions asked. While Juror No. 5 spoke fluent English, it is not her first language. Even some of the native English speakers had trouble discerning the recordings from the written transcripts of those recordings.

      c.  <u>The USB</u>

The jurors were asked whether they listened to conversations on a USB drive and all answered in the affirmative, though one juror—Juror No. 4—clarified that she did not recall what medium the recordings were on. (*Id*. throughout and at PageID# 6111). The Court views this testimony of limited value in determining whether the recordings were on a USB drive or some other medium. Except as discussed below, the jurors appeared focused on the fact that they listened to recordings, not the specific medium those recordings were on.

Two jurors, however, stated that they recognized the USB drive that was Carey Ex. 3. Juror No. 9 testified that he recognized it from the black color and red writing and stated that it was used on the tv to listen to the recording. (*Id*. at PageID# 6145-46). Juror No. 7 also testified that she remembered seeing the USB drive during deliberations. (*Id*. at PageID# 6197). She said it was used to play some of the recordings. (*Id*.).

      d.  <u>Spreadsheet</u>

The jurors were shown the spreadsheet that was Government Exhibit 359. All but two of the twelve jurors testified that they did not look at it or did not recall looking at it during deliberations. (*Id*. at PageID# 6106, 6112-13, 6124-25, 6136, 6148, 6156, 6175, 6196, 6214, 6224, 6234). Juror No. 7 said she looked at something similar, but did not think it was Government Exhibit 359. (*Id*. at PageID# 6196). Juror No. 3 was less certain. (*Id*. at PageID# 6165). She recalled a spreadsheet, but was not sure if it was Government exhibit 359. (*Id*.).

23

e. Red Binder

As explained above, during the hearing, the Court and the parties were operating under the misunderstanding that the defense exhibits were consolidated into the red binder before the exhibits were delivered to the jury for deliberations. As a result, the jurors were asked questions about whether they specifically looked at exhibits in the red binder. Most of the jurors responded that they generally recalled that the exhibits were in binders, but they were less confident about the color of the binders that they reviewed. (*See e.g.*, *id.* at PageID# 6106-07, 6113, 6125, 6137, 6166, 6213). Based on this testimony, the misunderstanding regarding the consolidation of exhibits did not materially affect the hearing.

From the testimony at the hearing, the Court concludes that at least one of the jurors reviewed the unredacted transcript of the excerpt of the recording of the October 25, 2021 meeting between Brockway and Conaway, which was Carey Exhibit 4. It is also likely that jurors listened to the unredacted recording. Two jurors recognized the appearance of the USB drive that was Carey Exhibit 3 and one juror said that it was used to play a recording. If that juror's recollection is accurate, it would have exposed all of the jurors to the unredacted recording.

## III. APPLICABLE LAW

Rule 33 of the Federal Rules of Criminal Procedure permits a district court to "vacate any judgment and grant a new trial if the interest of justice so requires." The decision whether to grant a new trial is left to the sound discretion of the district court. *United States v. Pierce*, 62 F.3d 818, 823 (6th Cir. 1995). Although Rule 33 does not define the "interests of justice," it is "widely agreed" that the standard "allows the grant of a new trial where substantial legal error has occurred." *United States v. Munoz*, 605 F.3d 359, 373 (6th Cir. 2010) (citing cases).

24

The Fifth and Sixth Amendments to the United States Constitution guarantee a criminal defendant a fair trial, which includes a trial by an impartial jury and the right to confront witnesses against him. U.S. Const. Amend. V and VI. Indeed, "the rights of confrontation and cross-examination are among the fundamental requirements of a constitutionally fair trial." *Parker v. Gladden*, 385 U.S. 363, 364 (1966). And "[t]he presence of even a single biased juror deprives a defendant of [their] right to an impartial jury." *Lanier*, 988 F.3d at 294 (citing *Williams v. Bagley*, 380 F.3d 932, 944 (6th Cir. 2004)).

The Court acknowledges that "a constitutional error does not automatically require reversal of a conviction." *See Weaver v. Massachusetts*, 582 U.S. 286, 294 (2017) (citing *Arizona v. Fulminante*, 488 U.S. 279, 306 (1991) (quoting *Chapman v. California*, 386 U.S. 18 (1967)). Usually, "if the government can show 'beyond a reasonable doubt that the error complained of did not contribute to the verdict,'" the error is deemed harmless, and the defendant is not entitled to a new trial. *Id*.

This harmless-error standard usually applies to circumstances in which extrinsic evidence has reached the jury. In the Sixth Circuit, however, the defendant has the burden to prove that "the improper contact caused actual prejudice to the verdict."[14] *In re Sittenfeld*, 49 F.4th 1061, 1066 (6th Cir. 2022). The Sixth Circuit is "the only circuit that places on the defendant the burden of

---

[14]    The Court notes that the Sixth Circuit is unique in placing the burden of proof on the defendant. *See Cunningham v. Shoop*, 23 F.4th 636, 648-49 (6th Cir. 2022) (explaining that, contrary to other circuits, the Sixth Circuit has concluded that *Smith v. Phillips*, 455 U.S. 209 (1982), "shifted [*Remmer*'s] burden of showing bias at *Remmer* hearings to defendants and stripped defendants of the presumption of prejudice"); *United States v. Zelinka*, 862 F.2d 92, 95 (6th Cir. 1988) ("This court has consistently held that *Smith v. Phillips* reinterpreted *Remmer* to shift the burden of showing bias to the defendant rather than placing a heavy burden on the government to show that an unauthorized contact was harmless."). Given the limits imposed on jury questioning by Federal Rule of Evidence 606(b), this Circuit's placement of the burden on the defendant creates a substantial challenge for the defendant to carry that burden.

proving bias … rather than requiring the Government to show 'that an unauthorized contact was harmless.'" *Lanier*, 988 F.3d at 295 (citing *United States v. Zelinka*, 862 F.2d 92, 95 (6th Cir. 1988)).

But the Supreme Court has also recognized that some errors are not amenable to harmless-error analysis. *See e.g.*, *Vasquez v. Hillery*, 474 U.S. 254 (1986) (unlawful exclusion of member of a grand jury based on race); *McKaskle v. Wiggins*, 465 U.S. 168, 177-178, n.8 (1984) (right to self-representation at trial); *Waller v. Georgia*, 467 U.S. 39, 49, n.9 (1984) (right to a public hearing); *White v. Maryland*, 373 U.S. 59 (1963) (right to counsel at preliminary hearing during which defendant entered a plea of guilty); *Tumey v. Ohio*, 273 U.S. 510, 535 (1927) (judge with financial interest in the outcome). When a constitutional error is not amenable to harmless-error analysis, the defendant is entitled to a new trial without a showing that the error affected the verdict. "[T]he term 'structural error' carries with it no talismanic significance as a doctrinal matter. It means only that the government is not entitled to deprive the defendant of a new trial by showing that the error was 'harmless beyond a reasonable doubt.'" *Weaver v. Massachusetts*, 582 U.S. 286, 299 (2017).

Defendants argue that the error resulted in fundamental unfairness to all parties which, due to the nature of the exhibits and the Court's evidentiary rulings, is not amenable to harmless-error review. Defendants contend the error is, therefore, structural and that they are entitled to new trials without regard to prejudice. The Government disagrees that the errors with the exhibits constitute structural error, noting that the Supreme Court has rarely held that an error is structural and never in circumstances like those here. The Government argues that the error is subject to harmless-error review and that the Court must apply the Sixth Circuit standard, which, as stated above, places the

26

burden on the defendant to prove that "the improper contact caused actual prejudice to the verdict." *In re Sittenfeld*, 49 F.4th at 1066.

## IV.  ANALYSIS

In *Arizona v. Fulminante*, 499 U.S. 279 (1991), the Supreme Court surveyed its previous rulings and divided trial errors into two categories: (1) those that constitute "structural defects in the constitution of the trial mechanism, which defy analysis by 'harmless-error' standards;" and (2) "trial errors" which "occurred during the presentation of the case to the jury, and which may therefore be quantitatively assessed in the context of other evidence presented in order to determine whether its admission was harmless beyond a reasonable doubt."  *Id*. at 307-09.

Eight years after *Fulminante*, the Court again addressed "structural error" in *Neder v. United States*, 527 U.S. 1 (1999), a case involving an erroneous jury instruction. Before concluding that the "harmless-error standard" applied, Chief Justice Rehnquist, writing for a unanimous court, drew distinctions between "trial errors" and "structural errors" and observed that the Court's previous cases viewed structural errors as those that "'infect the entire trial process' and 'necessarily render a trial fundamentally unfair.'" *Id*. at 8 (quoting *Brecht v. Abrahamson*, 507 U.S. 619, 630 (1993), and *Rose v Clark*, 478 U.S. 570, 579 (1986)). "Put another way, these [structural] errors deprive defendants of 'basic protections' without which 'a criminal trial cannot reliably serve its function as a vehicle for determination of guilt or innocence … and no criminal punishment may be regarded as fundamentally fair.'" *Id*. at 8-9 (quoting *Rose*, 478 U.S. at 577-78).

The Supreme Court again considered the structural error doctrine in *United States v. Gonzalez-Lopez*, 548 U.S. 140, 145 (2006). That case involved a convicted defendant who claimed

that his right to choose which attorney represented him during trial had been violated. *Id*. After reiterating that the Sixth Amendment right to counsel includes the right to counsel of one's own choosing, Justice Scalia went on to hold that the right to a "fair trial" was violated by the violation of the right to counsel, thus "[n]o additional showing of prejudice is required to make the violation 'complete.'" *Id.* at 146. Noting the distinctions between a defendant's right to counsel of his choice and the right to effective counsel, the Court had "little trouble concluding that erroneous deprivation of the right to counsel of choice, 'with consequences that are necessarily unquantifiable and indeterminate, unquestionably qualifies as structural error.'" *Id*. at 150 (citation omitted). Justice Scalia explained this conclusion by pointing out the numerous differences in the trial process that can result from having different counsel and succinctly observed: "Harmless-error analysis in such a context would be a speculative inquiry into what might have occurred in an alternate universe." *Id*.

In 2017, the Supreme Court returned to the structural error doctrine. *See Weaver v Massachusetts*, 582 U.S. 286 (2017). After surveying previous cases, Justice Kennedy observed that "the precise reason why a particular error is not amenable to [harmless-error] analysis—and thus the precise reason why the Court has deemed it structural—varies in a significant way from error to error." *Id*. at 295. The Court then summarized three rationales for why a particular error may be deemed structural: (1) "if the right at issue is not designed to protect the defendant from erroneous conviction but instead protects some other interest"; (2) "if the effects of the error are simply too hard to measure"; and (3) "if the error always results in a fundamental unfairness." [15]

---

[15] In identifying "at least three broad rationales," Justice Kennedy left open the possibility that there are other reasons a particular error is not amenable to harmless-error review. *Weaver*, 582 U.S. at 295.

*Id.* at 295-96. More than one of these rationales may be part of the reason an error is deemed to be structural, but Justice Kennedy emphasized that "an error can count as structural even if the error does not lead to fundamental unfairness in every case." *Id.* at 296 (citing *Gonzalez-Lopez*, 548 U.S. at 149, n.4 (rejecting the idea that structural errors "always or necessarily render a trial fundamentally unfair and unreliable")).

In determining whether this error is structural, which automatically requires a new trial, or is a trial error subject to harmless-error inquiry, the Court is mindful that the Supreme Court has cautioned trial courts about the danger of "import[ing] into the initial structural-error determination (*i.e.* whether an error is structural) a case-by-case approach that is more consistent with our traditional harmless-error inquiry (*i.e.*, whether an error is harmless)." *Neder*, 527 U.S. at 14.

With this background in mind, the Court finds that the errors in presenting certain exhibits to the jury constitute structural error. Before explaining this conclusion, the Court finds it important to first address fairness, which is the basis for the third category of structural error described in *Weaver*. 582 U.S. at 296. Justice Kennedy stated that one rationale for finding an error structural is when the error *always* results in fundamental unfairness. *Id.* The errors here do not fall into this *Weaver* category—there is no question that circumstances in which extraneous information reaches the jury do not result in fundamental unfairness in every case.[16] But it bears mentioning that the errors in this case *did* result in fundamental unfairness. Here, due to an administrative mistake, the court provided the jury exhibits that had not been admitted into evidence. And, unlike cases in which the extraneous information is obviously not part of the

---

[16]     The Court does not consider whether there is a threshold above which the quantity of extraneous evidence provided to the jury would result in fundamental unfairness in every case.

evidence presented during the trial, this extraneous evidence was delivered to the jury in evidence binders, in some cases marked with evidence stickers. Likely in part because of the apparent imprimatur of the Court, the error went unnoticed until well after the jury reached a verdict. Defendants are not entitled to a perfect trial, but they are entitled to a fair trial. *Lutwak v United States*, 344 U.S. 604, 619 (1953). The error here resulted in fundamental unfairness to these defendants.

The error here implicates the second rationale articulated by Justice Kennedy in *Weaver* – the effects of the error are simply too hard to measure. *Weaver*, 582 U.S. at 295. This is largely because of the Court's conditional ruling that admission of Carey Exhibits 3 and 4 would lead to additional admissible evidence. Brockway and Maund both expressed intentions of introducing statements made during the July 2020 meeting if Carey Exhibit 3 was admitted and they were denied the opportunity to do so based on the mistaken understanding that the jury would not receive Carey Exhibit 3.

This is not the first case where trial jurors have received documents or other extraneous information not admitted in court, nor will it be the last. Typically, such error is amenable to harmless-error inquiry.[17] The structural error here is distinguishable because the Court had ruled that the erroneously provided documents would open the door to the presentation of additional evidence. Thus, any inquiry into prejudice would necessitate consideration not only of the effects

---

[17] Although circumstances in which extraneous information reaches the jury are usually amenable to harmless-error analysis, other courts have found structural error when the Court provided the jury incriminating evidence that had not been presented at trial. *See e.g., United States v. Noushfar*, 78 F.3d 1442, 1445 (9th Cir. 1996) (finding that sending tapes to the jury room "violate[d] the basic framework of the trial system" and that "where the error is so fundamental and defies meaningful review … harmless or plain error analysis may not be applied"), amended by *United States v. Noushfar*, 78 F.3d 1442 (9th Cir. 1996).

of the evidence erroneously presented to the jury, but also the effects of evidence ***not*** presented, not to mention speculation about the potential arguments of counsel had the various exhibits been properly admitted. Neither the parties nor the Court can know what impact, if any, the evidence Brockway and Maund would have introduced would have on the jury because they were not given that opportunity, nor was Carey or the Government given the opportunity to test that evidence through cross-examination or rebuttal evidence.

Had the same circumstances occurred without Brockway or Maund stating what they would do if Carey sought to admit his Exhibit 3, then giving Exhibit 3 to the jury may have fallen under the "harmless-error" standard like numerous cases involving jury access to extraneous information. *See e.g.*, *United States v. Lanier*, 988 F.3d 284 (6th Cir. 2021); *Ewing v. Horton*, 914 F.3d 1027 (6th Cir. 2019); *United States v. Gonzalez*, 227 F.3d 520 (6th Cir. 2000); *United States v. Walker*, 1 F.3d 423 (6th Cir. 1993); *United States v. Zelinka*, 862 F.2d 92 (6th Cir. 1988); *United States v. Pennell*, 737 F.2d 521 (6th Cir. 1984). But nobody can measure, with any degree of certainty, the effects of something that did not happen. *Weaver*, 582 U.S. at 295. Under the circumstances here, "[h]armless-error analysis … would be a speculative inquiry into what might have occurred in an alternate universe." *Gonzalez-Lopez*, 548 U.S. 150.

The jury was exposed to extraneous evidence upon which the Court conditioned potential submission of other evidence, the effects of which are too hard to measure. The Court thus finds the error in this case is not amenable to harmless-error analysis and the defendants are entitled to a new trial without a showing of prejudice. *See Weaver*, 582 U.S. at 295-96. Indeed, it would be fundamentally unfair to expect the defense to meet such a burden under these circumstances when

31

the uncertainties of the effects of the additional evidence make such a showing virtually impossible.

## V. CONCLUSION

For the reasons stated, defendants' motions for a new trial (Doc. Nos. 491, 496, 493) are **GRANTED**. The new trial will be on only the counts on which the jury found the defendants guilty, as double jeopardy bars retrial of acquitted counts. *See Benton v. Maryland*, 395 U.S. 784, 796 (1969) (holding that the Double Jeopardy Clause barred retrial on acquitted count after the jury returned a split guilty/not guilty verdict); *Tibbs v. Florida*, 457 U.S. 31, 41 (1982) ("A verdict of not guilty, whether rendered by the jury or directed by the trial judge, absolutely shields the defendant from retrial.").

It is so **ORDERED**.

_____

WILLIAM L. CAMPBELL, JR.
CHIEF UNITED STATES DISTRICT JUDGE